# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | |
|---|---|
| JULIE WUERTZ,<br><br>　　　　　Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>　　　　　Defendant. | CASE NO. 3:25-CV-00742-JJH<br><br>JUDGE JEFFREY J. HELMICK<br><br>MAGISTRATE JUDGE DARRELL A. CLAY<br><br>**REPORT AND RECOMMENDATION** |

## INTRODUCTION

Plaintiff Julie Wuertz challenges the Commissioner of Social Security's decision denying supplemental security income (SSI). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter was referred to me under Local Civil Rule 72.2 to prepare a Report and Recommendation. (Non-document entry dated Apr. 14, 2025). For the reasons below, I recommend the District Court **REVERSE** the Commissioner's decision and **REMAND** the matter for further administrative proceedings.

## PROCEDURAL BACKGROUND

Ms. Wuertz previously applied for SSI and disability insurance benefits (DIB) and her claims were most recently denied on May 4, 2021. (*See* Tr. 103). Ms. Wuertz re-applied for SSI on April 20, 2023. (Tr. 222).[1] She alleged she became disabled beginning September 6, 2022 due to

---

[1]　　　Ms. Wuertz also re-applied for DIB, but that claim was rejected because she had not worked long enough to be eligible for DIB. (*See* Tr. 139). She did not further pursue that claim administratively (*See* Tr. 320) (arguing "Because this is an SSI only claim . . . .").

1

degenerative disc disease, chronic back pain, agoraphobia, post-traumatic stress disorder, borderline personality disorder, and anxiety. (*See* Tr. 118). After her claim was denied initially and on reconsideration, Ms. Wuertz requested a hearing before an administrative law judge. (Tr. 144, 151, 160). On April 18, 2024, Ms. Wuertz (represented by counsel) and a vocational expert (VE) testified before the ALJ. (Tr. 33-57). On May 14, 2024, the ALJ again determined Ms. Wuertz was not disabled. (Tr. 17-28). On February 25, 2025, the Appeals Council denied Ms. Wuertz's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-3; *see also* 20 C.F.R. § 416.1481). Ms. Wuertz timely filed this action on April 14, 2025. (ECF #1).

FACTUAL BACKGROUND

## I.      Personal and Vocational Evidence

Ms. Wuertz was 34 years old as of her claimed May 4, 2021 disability date and 36 years old at the 2024 hearing. (*See* Tr. 118, 33). She completed high school but has no past relevant work. (*See* Tr. 40-41).

## II.     Relevant Medical Evidence

Ms. Wuertz is diagnosed with major depressive disorder, borderline personality disorder, and insomnia. (Tr. 1308). She receives regular psychiatric treatment and was prescribed medications with routine medication-management appointments since at least November 2021 and occurring about every three months. (*See, e.g.,* Tr. 1309, 1331, 1353, 1376, 1399, 1422, 1652, 1664, 1675).

On April 8, 2022, Ms. Wuertz was admitted to the emergency room for depression with suicidal ideation and a plan following a week of accumulating issues at work, school, and home. (*See* Tr. 615, 620). She was voluntarily hospitalized for four days for psychiatric stabilization, medication management, and group therapy. (Tr. 619, 625-26, 645-46, 657-58 672-74). There, she

2

was transitioned from her previous medications (Paxil and Rexulti) to Atarax for anxiety and Effexor for anxiety and depression.[2] (Tr. 673-74). She was discharged on April 12 with instructions to follow up with her outpatient psychological therapy appointments. (Tr. 674).

In one such outpatient appointment in July 2021, she reported being fired as a part-time debt collector "after not picking up the material fast enough." (Tr. 1309). She reported looking for a new job in September 2022. (Tr. 1353). By December, she reported quitting her job two months before because her "work was messing with [her] mental health and she was not making enough to justify." (Tr. 1376). She attended college at the time but was taking a single class at a time and needed due-date extensions. (*Id.*).

In March 2023, she reported passing her class but worried about her finances because "going back to work causes her anxiety." (Tr. 1399). By May, she was failing her class; had feelings of helplessness, depression, and low motivation; and reported multiple panic attacks after her boyfriend's nephew screamed in the house while he played video games. (Tr. 1422). Her depression worsened through August. (Tr. 1675). By November 2023, she experienced another panic attack from her boyfriend's nephew again screaming in the house. (Tr. 1653). By February 2024, Ms. Wuertz reported her medications were working well, though she acknowledged not

---

[2]        Paxil is a brand name for paroxetine, a medication prescribed to treat depression, anxiety, and other mental conditions. *See Paroxetine*, *MedlinePlus*, http://medlineplus.gov/druginfo/meds/a698032.html (last accessed Mar. 23, 2026). Rexulti is a brand name for brexpiprazole, an antipsychotic prescribed alongside antidepressants to treat depression. *See Brexpiprazole*, *MedlinePlus*, http://medlineplus.gov/druginfo/meds/a615046.html (last accessed Mar. 23, 2026).
        Atarax is a brand name for hydroxyzine, an antihistamine that can be prescribed to relieve anxiety and tension. *See Hydroxyzine*, *MedlinePlus*, http://medlineplus.gov/druginfo/meds/a682866.html (last accessed Mar. 23, 2026). Effexor is a brand name for venlafaxine, a medication prescribed to treat depression, anxiety disorders, and panic disorder. *See Venlafaxine*, *MedlinePlus*, http://medlineplus.gov/druginfo/meds/a694020.html (last accessed Mar. 23, 2026).

taking Atarax "in a long time." (Tr. 1664). She asked to increase her medications and was prescribed Neurontin.[3] (*Id.*). In each of these three visits, Ms. Wuertz's borderline personality disorder was exacerbated. (Tr. 1427, 1680, 1658, 1669).

In addition to her psychological conditions, Ms. Wuertz has suffered from chronic back pain since she was hit by a car while riding her bicycle sometime before 2020. (*See* Tr. 743, 1447). When examined in December 2021, she had a limited range of motion in her lumbar spine and described her pain as intermittently radiating down her leg. (*Id.*). She was diagnosed with a lumbar disc herniation and lumbar radiculitis. (Tr. 747). An MRI of her lumbar spine taken in June 2022 showed a stable large left paracentral disc protrusion at the L1-L2 joint resulting in moderate central canal stenosis; left lateral recess stenosis; a new small left foraminal disc protrusion at the L4-L5 joint that caused effacement of the exiting left L4 nerve root; and a small left paracentral disc protrusion at the T11-T12 joint. (Tr. 834). Ms. Wuertz's neurosurgeon interpreted the MRI to show a disc herniation causing stenosis of the central canal. (Tr. 563).

In August 2022, Ms. Wuertz underwent a laminectomy and a microdiscectomy, two "minimally invasive" surgeries on her L1-L2 joint. (*See* Tr. 537). After the operation, she was "[s]till with axial discomfort and some pain to lateral aspects of both legs" though her right leg pain had improved. (Tr. 529). A few months later, she had "complete resolution of her right-sided numbness tingling pain and radiating discomfort" but still had 5/10 "right-sided paraspinal

---

[3]     Neurontin is a brand name for gabapentin, an anticonvulsant sometimes prescribed to relieve neuropathic pain. *See Gabapentin*, *MedlinePlus*, http://medlineplus.gov/druginfo/meds/a694007.html (last accessed Mar. 23, 2026).

discomfort" so she was prescribed prednisone for her symptoms.[4] (Tr. 435, 438). She completed a course of post-surgery physical therapy with 4/5 and 4+/5 strength, flexion, and extension through pain. (*See, e.g.*, Tr. 405-07).

Another MRI taken in December 2022 showed (1) a left paracentral disc extrusion at the L1-L2 joint, which narrowed the left lateral recess, and (2) a left foraminal disc protrusion at the L4-L5 joint with mild-to-moderate left foraminal narrowing and disc material abutting the exiting left L4 nerve root. (Tr. 821-22). Ms. Wuertz's neurosurgeon noted there were no surgical findings on the MRI and recommended to maintain conservative treatment. (Tr. 393).

In March 2023, Ms. Wuertz went to the emergency room because her chronic back pain left her unable to perform tasks like washing the dishes. (Tr. 385). She was diagnosed with lumbar strain and an acute exacerbation of her chronic pain, provided prednisone, and discharged to follow up with her regular physician. (Tr. 388). She reported similar symptoms to her regular physician (*see* Tr. 376-77) and she was diagnosed with lumbar post-laminectomy syndrome (Tr. 380). She was recommended additional imaging and lumbar epidural injections for her pain, but further surgery was not recommended. (Tr. 377). The same month, she reported to her psychologist that her back problems and her then-broken foot left her physically unable to work. (Tr. 1399).

In April 2023, Ms. Wuertz received transforaminal lumbar epidural steroid injections into her L1 and L2 vertebral levels. (Tr. 368). But in May, she reported the injections did not provide much relief and a physical examination showed a limited lumbar range of motion, pain rated at

---

[4] Prednisone is a corticosteroid prescribed to treat a variety of conditions, including pain. *See Prednisone, MedlinePlus*, http://medlineplus.gov/druginfo/meds/a601102.html (last accessed Mar. 23, 2026).

7/10, and her pain was reproduced by femoral nerve stretching. (Tr. 363, 366). A July 2023 x-ray of her lumbar spine showed "loss of intervertebral disc height in the lower lumbar spine" and "moderate facet hypertrophic changes." (Tr. 337). She reported receiving another injection in August that again "resulted in minimal reduction in her pain levels." (*See* Tr. 1447). In other physical therapy sessions over July to October 2023, she had 4 and 4+/5 hip and knee flexion, 5/5 knee extension, and decreased lumbar flexion. (Tr. 1448-49; *compare* Tr. 405-07 (similar strength, flexion, and extension in 2022)). Her physical therapist noted she was "functionally limited in sitting, standing, [and] walking for extended periods of time, thus limiting [her] ability to perform online school, work, acting, and video games" and recommended more physical therapy. (Tr. 1449). In November 2023, she reported to her orthopedist she was "about 40% improved" by physical therapy, used a TENS unit[5] with minimal improvement, and rated her pain at 7-to-8/10. (Tr. 1580-81, 1592).

MRIs of Ms. Wuertz's thoracic and lumbar spine taken in January 2024 showed a disc extrusion at the T11-12 level resulting in mild left foraminal stenosis and mild spinal canal stenosis with contact of the left ventral surface of the cord, interval right L1 hemilaminectomy, residual/recurrent left subarticular disc extrusion at L1-L2 impinging on the transversing left L2 nerve root, left foraminal/extraforaminal disc protrusions at L3-L4 and L4-L5 with abutment of the existing left L3 and L4 nerve roots. (Tr. 1559-60, 1563). In February, she reported continuing chronic back pain and that she had been prescribed Neurontin for nerve pain. (Tr. 1664).

---

[5]     A transcutaneous electrical nerve stimulation (TENS) unit is a small device that sends low-voltage electrical currents at or near the nerves to relieve pain. *See Transcutaneous Electrical Nerve Stimulation (TENS), Cleveland Clinic*, http://my.clevelandclinic.org/health/treatments/15840-transcutaneous-electrical-nerve-stimulation-tens (last accessed Mar. 23, 2026).

### III.    Prior Administrative Medical Findings

On May 4, 2021, the ALJ in Ms. Wuertz's most recent application for benefits concluded she had the following residual functional capacity:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. § 416.967(a) except: occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; and occasionally stoop, kneel, crouch, and crawl; She can never be exposed to hazards such as moving machinery, unprotected heights or occupational driving. She can perform simple, routine, and repetitive tasks, but not at a production rate pace (so, for example, no assembly line work). She can respond appropriately to occasional interaction with supervisors, co-workers and the general public.

(Tr. 94-95) (cleaned up).

On July 26, 2023, state agency medical consultant Charles Gruenwald opined Ms. Wuertz could lift and carry 20 pounds occasionally and 10 pounds frequently; stand, walk, or sit for about six hours in an eight-hour workday; frequently climb ramps and stairs; occasionally climb ladders, ropes, and scaffolds; and frequently stoop. (Tr. 123). On November 6, 2023, state agency medical consultant Steve McKee, M.D., adopted Mr. Gruenwald's findings. (Tr. 136).

On initial review on August 26, 2023, the state agency psychological consultant did not issue an opinion on Ms. Wuertz's mental functioning, instead concluding her "psych condition [was] assessed as not severe" and her "[mental] functioning [was] no more than mildly impaired." (*See* Tr. 121-22). On reconsideration review in October 2023, state agency psychological consultant Deryck Richardson, Ph.D., adopted the findings by the ALJ in 2021. (Tr. 137).

### IV.    Relevant Testimonial Evidence

Ms. Wuertz explained she could not work because of her chronic back pain. (Tr. 41-42). She also has neuropathic shoulder pain, though the main pain is in her back. (Tr. 43). Pain has caused basic daily tasks like showering, dressing, or washing dishes to become increasingly difficult.

7

(Tr. 41). For example, the morning of the hearing she was scrambling eggs for breakfast and was in excruciating pain within about three minutes. (Tr. 49). She can do household tasks for typically seven minutes before she is in pain. (*Id.*). She can sit for about 15 minutes before she has to lay down for 30 to 50 minutes to relieve her pain. (Tr. 41, 49-50). She will lay down about 10 to 12 times a day. (Tr. 49-50). Walking also causes constant pain. (Tr. 50). She estimates she can stand for about seven to eight minutes and lift at most ten pounds. (Tr. 52, 53). She does not have a driver's license as her back pain would make driving too difficult. (Tr. 40).

Ms. Wuertz is not currently prescribed pain medications, though she takes over-the-counter pain relievers. (Tr. 42). She uses a heating pad, a TENS unit, and hot showers for pain relief, but they only provide temporary relief. (*Id.*). The only part of the day she is not in pain is when she sleeps with the aid of her insomnia medication. (Tr. 50). While she had steroid injections, the relief was "very temporary." (Tr. 43). She had back surgery in August 2022, but it did not bring her relief, and her pain had since worsened. (Tr. 52-53).

Ms. Wuertz lives with her long-term boyfriend and his family. (Tr. 40). She worked for about eight months after her August 2022 back surgery though she quit because her back pain did not improve after the surgery. (Tr. 40-41). She intended to find another job once she recovered, but recovery had not yet happened. (Tr. 41).

At the time of the hearing, Ms. Wuertz was taking an online college course in website design. (*See* Tr. 44-46). She had previously studied business in 2021, though she had to stop after about six to twelve months because she could not keep up with the workload of multiple classes and she struggled to understand and remember the concepts. (*See* Tr. 45-46). She was "always" in pain and could only sit for about 15 minutes before needing to lay down. (Tr. 45). In addition to

8

pain, she struggles with concentrating and would get distracted while completing assignments and "have to get up and walk away for a bit" and return more focused. (Tr. 43-44).

Her current class is self-paced with the option to attend live-broadcast lectures or watch the replay. (Tr. 46). Assignments are due each week, which Ms. Wuertz described as "a good amount of time to get things done. You know, even with my physical and mental issues." (*Id.*). Ms. Wuertz often received extra time for assignments and limited herself to just one class at a time. (Tr. 46-47). One class took her a year to complete. (*Id.*).

Ms. Wuertz previously livestreamed on Twitch, an online platform for live video broadcasts, typically of people playing video games. (Tr. 47). She stopped after about a month because her pain and mental health worsened. (*Id.*). She streamed for about two hours at a time, though she had to shift positions every few minutes to relieve pain. (Tr. 47). She would also lose interest in the game and have to take a break to return more focused. (Tr. 48).

**STANDARD FOR DISABILITY**

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* § 1382c(a)(3)(A); *see also* 20 C.F.R. § 416.905(a).

The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 416.920—to determine whether a claimant is disabled:

1.      Was claimant engaged in a substantial gainful activity?

9

2.      Did claimant have a medically determinable impairment, or a combination of impairments, which is "severe," defined as one which substantially limits an individual's ability to perform basic work activities?

3.      Does the severe impairment meet one of the listed impairments?

4.      What is claimant's residual functional capacity and can claimant perform past relevant work?

5.      Can claimant do any other work considering his or her residual functional capacity, age, education, and work experience?

Under this sequential analysis, the claimant has the burden of proof through Step Four. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to prove whether the claimant has the residual functional capacity (RFC) to perform available work in the national economy. *Id.* The ALJ considers the claimant's RFC, age, education, and past work experience to determine whether the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is the claimant deemed disabled. 20 C.F.R. § 416.920(c)-(f); *see also Walters*, 127 F.3d at 529.

### THE ALJ'S DECISION

At Step One, the ALJ determined that although Ms. Wuertz had worked after her application date, that work did not constitute substantial gainful employment. (Tr. 19). At Step Two, the ALJ identified the following severe impairments:

[P]ersistent depressive disorder; panic disorder; unspecified trauma and stressor disorder; post-traumatic stress disorder (PTSD); anxiety; bilateral knee chondromalacia; and degenerative disc disease of the lumbar spine with left-sided L1 disc herniation in addition to thoracic and cervical degenerative changes.

(Tr. 20). At Step Three, the ALJ found Ms. Wuertz's impairments did not meet or medically equal the requirements of a listed impairment. (Tr. 20-22).

At Step Four, the ALJ determined Ms. Wuertz's RFC as follows:

After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. § 416.967(a) with the following additional limitations: occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally stoop, kneel, crouch, and crawl; no exposure to hazards such as moving machinery, unprotected heights or occupational driving; understand, remember, and carry out simple instructions and tasks; cannot perform work requiring a specific production rate such as assembly line work or work that requires hourly quotas; and occasional interaction with supervisors, coworkers, and the public.

(Tr. 22) (cleaned up). The ALJ concluded Ms. Wuertz did not have past relevant work and so proceeded to Step Five. (Tr. 27). At Step Five, the ALJ concluded Ms. Wuertz could work as a document preparer, polisher, and sorter. (*See* Tr. 27-28). Thus, the ALJ concluded Ms. Wuertz was not disabled. (Tr. 28).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters*, 127 F.3d at 528. The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "Substantial evidence" is "more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). But "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the

11

substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F.App'x 636, 641 (6th Cir. 2013) (cleaned up).

In determining whether substantial evidence supports the Commissioner's findings, the court does not review the evidence de novo, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence (or indeed a preponderance of the evidence) supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Apart from considering whether substantial evidence supports the Commissioner's decision, the court must determine whether proper legal standards were applied. The failure to apply correct legal standards is grounds for reversal. *Walters*, 127 F.3d at 528. Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not follow its own regulations and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted); *accord Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked.").

12

## DISCUSSION

Ms. Wuertz makes two related arguments each asserting the RFC lacks substantial evidence because the ALJ ignored contrary evidence. First, she argues the ALJ ignored evidence of psychological hospitalization and other evidence of deteriorating mental impairment since the 2021 disability hearing decision. (ECF #11 at PageID 1742-45). Second, she argues the ALJ did not address abnormal examination findings about her chronic back pain nor discuss imaging indicating an impingement of her nerve root. (*Id.* at PageID 1746-48).

A claimant's "residual functional capacity is the most [she] can still do despite [her] limitations." 20 C.F.R. § 416.945(a)(1). An ALJ assesses a claimant's RFC based on "all the relevant evidence" in the case record. *Id.* In deciding the RFC, "the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer*, 774 F.Supp.2d at 881. At the same time, the ALJ need not discuss every piece of evidence so long as the ALJ considers the evidence as a whole and reaches a reasoned conclusion. *Boseley v. Comm'r of Soc. Sec.*, 397 F.App'x 195, 199 (6th Cir. 2010).

I. **Remand is warranted for the ALJ to correct the multiple incorrect findings that Ms. Wuertz had not been psychologically hospitalized when she had been hospitalized, eliminate any inferences drawn from those faulty findings, and issue an RFC based on the record as a whole.**

Ms. Wuertz argues the ALJ erroneously concluded her "mental health condition has remained stable since the prior decision without any evidence of deterioration" and she "was without exacerbation requiring emergency room presentation or hospitalization" when the ALJ's summary does not mention her April 2022 four-day hospitalization. (ECF #11 at PageID 1743) (quoting Tr. 25). Ms. Wuertz also argues the ALJ selectively cited from the mental-status

13

examinations and did not comment on the notes from her psychological therapy sessions. (*Id.* at PageID 1743-44). The Commissioner responds Ms. Wuertz's hospitalization was just outside the one-year lookback for SSI claims and the omission was harmless because the persuasive prior administrative findings considered the psychiatric hospitalization when opining on Ms. Wuertz's mental limitations. (ECF #13 at PageID 1756-57). Ms. Wuertz replies the Commissioner misapplied the look-back regulation and the ALJ's cursory explanation for adopting the prior administrative findings did not cure the lack of explanation of contrary evidence. (ECF #14 at PageID 1763-66).

For organizational clarity, I begin with Ms. Wuertz's argument that the ALJ selectively cited from the mental-status examinations and then turn to the argument about the ALJ misrepresenting the record around her hospitalization.

> **A.      The ALJ's analysis of the mental-status examination findings as whole does not show a selective review of the record.**

Ms. Wuertz argues the ALJ selectively cited from the mental-status examinations and ignored contrary evidence to find Ms. Wuertz's mental condition had not worsened since the 2021 ALJ decision. (ECF #11 at PageID 1743-44). She points to mental status examinations showing irritability, anxiety and depression that worsens around the holidays, panic attacks, and an exacerbated borderline personality disorder. (*See id.*) (citing Tr. 1334, 1356, 1379-80, 1422, 1427, 1675, 1679-80, 1653, 1664).

First, Ms. Wuertz argues the ALJ did not address her irritable mood, but going through the examinations does not show a misrepresentation. In July 2022, the examination documents the irritability was caused by the taxi not arriving to take her to her appointment and otherwise, she reported "things have been going well" and denied stress, suicidal ideation, panic attacks. (*See*

Tr. 1331). Similarly, in September 2022, the taxi did not arrive to pick her up and there was added family stress from the recent passing of her boyfriend's mother and the house being crowded with family members and, again she denied suicidal ideation and feeling hopeless, helpless, or worthless. (Tr. 1353). That the ALJ mentioned the mental-status examinations in July and September but did not mention Ms. Wuertz's mood was irritable suggests the ALJ discounted those findings as outliers due to the external cause and the denial of more serious mood issues. (*See* Tr. 25) (citing Tr. 1331, 1353). In so doing, the ALJ's "factual findings as a whole" about Ms. Wuertz's mood show the ALJ "implicitly resolved the conflicts in the evidence." *See Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F.App'x 426, 437 n.11 (6th Cir. 2014).

Next, Ms. Wuertz argues the ALJ failed to consider Ms. Wuertz's anxiety and depression worsened around the holidays. (ECF #11 at PageID 1743) (citing Tr. 1379-80). Yet, the ALJ did consider her seasonal mood, finding about the December 2022 examination "she endorses slight feelings of hopelessness, helplessness, and worthlessness. Most is related to financial issues and not being able to purchase gifts for others." (Tr. 25) (citing Tr. 1376). The examinations reported Ms. Wuertz's seasonal mood issues were associated with financial worries. (*See* Tr. 1376, 1664).

Last, Ms. Wuertz argues the ALJ did not comment on other relevant treatment notes from May 2023 through February 2024 showing her struggling in school, having panic attacks triggered by her boyfriend's nephew screaming at home, and an exacerbated borderline personality disorder. (ECF #11 at PageID 1743-44). It bears repeating that an ALJ need not "discuss each piece of data in [the] opinion, so long as [the ALJ] consider[s] the evidence as a whole and reach[es] a reasoned conclusion." *Boseley*, 397 F.App'x at 199.

Regarding the mental examinations, the ALJ found Ms. Wuertz "had stability without side effects to the medications, and mental status exams noted limited finding." (Tr 26) (citing Tr. 1305-1437, 1652-92). Despite the broad citations, the mental status examinations confirm Ms. Wuertz reported her medication worked well and without side effects from May 2023 through February 2024. (Tr. 1422, 1675, 1653, 1664). And the mental status examinations showed normal findings over that period with a consistent "poor" rating for insight and judgment and one finding a "blunted/flat affect" despite her borderline personality disorder being diagnosed as "exacerbated." (*See* Tr. 1425-27 (finding just "poor" insight and judgment despite exacerbated borderline personality disorder), 1678-80 (same) 1656-58 (finding "blunted/flat affect" and poor insight and judgment) 1667-69 (again finding just "poor" insight and judgment despite exacerbated borderline personality disorder). Thus, the ALJ's findings accurately describe the mental status examinations during this time period.

Contrary to Ms. Wuertz's assertion, the ALJ did comment on the evidence, just at a more general level. Thus, unlike the discussion of Ms. Wuertz's hospitalization, the ALJ did not mischaracterize the mental-status examinations. While Ms. Wuertz may have preferred the ALJ commented more on her exacerbated borderline personality disorder or seasonal mood issues instead of her stable medication and limited findings in mental-status examinations, the District Court may not independently reweigh the various treatment records and decide for itself which of the findings best describe Ms. Wuertz's condition. *See Brainard*, 889 F.2d at 681.

I thus decline to recommend remand for this specific reason. But, as discussed below, remand remains warranted for the ALJ to re-evaluate the mental RFC based on the record as a whole.

**B.** **The ALJ mischaracterized the record in finding Ms. Wuertz had not been psychiatrically hospitalized when she had been hospitalized for depression and suicidal ideation.**

When explaining the RFC at Step Four, the ALJ made three express findings that Ms. Wuertz had neither presented to the emergency room nor been hospitalized because of her psychiatric conditions:

> The claimant was treated for depression and borderline personality disorder. However, *she was without exacerbation requiring emergency room presentation or hospitalization.*
>
> * * *
>
> Therefore, based on a review of the entire record, the claimant is able to understand, remember, and carry out simple instructions and tasks; cannot perform work requiring a specific production rate such as assembly line work or work that requires hourly quotas; and have only occasional interaction with supervisors, coworkers, and the public. The claimant's mental health condition has remained stable since the prior decision without any evidence of deterioration.
>
> * * *
>
> By way of summary, the undersigned finds the residual functional capacity described above is supported by the record, when considered as a whole, and especially in light of the clinical deficits noted in the treatment records and examination reports; her course of treatment; *the absence of inpatient hospitalization*; the opinions of Dr. Richardson; and the claimant's continued activities . . . Further, the records note she was doing well from a mental health standpoint and *there is no evidence of any ER or hospital admissions for any me[n]tal issues*, she had stability without side effects to the medications, and mental status exams noted limited finding.

(Tr. 25, 26) (citation omitted, emphasis added).

The record confirms Ms. Wuertz presented to the emergency room on April 8, 2022 with depression with suicidal ideation and a plan because of a week with accumulating issues at work, school, and home. (*See* Tr. 615, 620). She was admitted to the hospital for four days for psychiatric stabilization, medication management, and group therapy. (Tr. 625-26, 645-46, 657-58 672-74). Thus, the ALJ's trio of findings that she had not been hospitalized is demonstrably incorrect. I

turn next to whether remand is warranted in light of the ALJ's mischaracterization of the record evidence.

> **C.** **The ALJ's mischaracterizations deprive the mental RFC of substantial evidence because the ALJ neither reviewed the record as a whole nor built an accurate and logical bridge between the evidence and the conclusion.**

I conclude the ALJ's mischaracterizations of the record evidence warrant remand for two independent reasons. First, the mischaracterizations deprive the mental RFC of substantial evidence because they show the ALJ did not review the record as a whole or resolve conflicts in the evidence. Second, the mischaracterizations show the ALJ did not build an accurate and logical bridge between the evidence and the ultimate conclusion of no disability.

While the substantial-evidence standard is deferential, it "does not permit a selective reading of the record" and substantiality "must be based upon the record taken as a whole" and "take into account whatever in the record fairly detracts from its weight." *Brooks*, 531 F.App'x at 641 (cleaned up). While the ALJ need not discuss every piece of evidence and finding in the record, the ALJ's "factual findings as a whole" must show the ALJ "implicitly resolved the conflicts in the evidence." *Smith-Johnson*, 579 F.App'x at 437 n.11. And an explanation premised on a mischaracterization may deprive the analysis of the support of substantial evidence. *See Simpson v. Comm'r of Soc. Sec.*, 344 F.App'x 181, 191 (6th Cir. 2009) (finding ALJ decision lacked the support of substantial evidence where the decision was premised on "a clear mischaracterization of the facts"); *White v. Comm'r of Soc. Sec.*, 312 F.App'x 779, 787-88 (6th Cir. 2009) (finding ALJ lacked substantial evidence to support RFC after mischaracterizing evidence). Here, the ALJ thrice mentioned that Ms. Wuertz's psychological condition did not require hospitalization (when she had been hospitalized). This shows the ALJ did not review the record as a whole or resolve conflicts in the evidence, thus depriving the mental RFC of substantial evidence.

18

At the same time, this Court cannot uphold an ALJ's decision even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer*, 774 F.Supp.2d at 877. It bears repeating that in rendering the RFC decision, "the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Id.* at 881. This is because "[i]f relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked." *Shrader*, 2012 WL 5383120, at *6.

The ALJ's first mention of hospitalization most directly shows the faults in the decision. The ALJ found "[t]he claimant was treated for depression and borderline personality disorder (Exhibit C3F, p.266). However, she was without exacerbation requiring emergency room presentation or hospitalization." (Tr. 25). But page 266 of Exhibit C3F documents Ms. Wuertz presenting to the emergency room for depression with the caption "MERCY ST CHARLES ED EMERGENCY DEPARTMENT ENCOUNTER." (Tr. 615) (capitalization in original). The rest of that page describes the treatment of her back pain, so the ALJ *necessarily* cited to the emergency-room note to support the finding that Ms. Wuertz "was treated for depression and borderline personality disorder." Yet, the ALJ does not resolve the logical conflict that the cited evidence for one finding contradicts the conclusion Ms. Wuertz "was without exacerbation requiring emergency room presentation or hospitalization."

The ALJ's other two references to a purported lack of hospitalization suffer similar faults. When summarizing the discussion at Step Four, the ALJ first states

> By way of summary, the undersigned finds the residual functional capacity described above is supported by the record, when considered as a whole, and especially in light

19

of the clinical deficits noted in the treatment records and examination reports; her course of treatment; *the absence of inpatient hospitalization*; the opinions of Dr. Richardson; and the claimant's continued activities . . . Further, the records note she was doing well from a mental health standpoint and *there is no evidence of any ER or hospital admissions for any me[n]tal issues*, she had stability without side effects to the medications, and mental status exams noted limited finding.

(Tr. 26) (emphasis added). This discussion does not suggest that the ALJ concluded the hospitalization was less probative of disability because it occurred in 2022 or less persuasive than other evidence in the record. Rather, the ALJ states the hospitalization simply did not occur. The ALJ then compounds that error by inferring from the purported lack of hospitalization that Ms. Wuertz's psychological conditions are less limiting.

The ALJ's mischaracterizations of Ms. Wuertz's hospitalization, together with the negative inference the ALJ drew from the purported absence of hospitalization, show the mental RFC is not based on substantial evidence and remand is warranted. The ALJ did not "implicitly resolve[] the conflicts in the evidence" as demonstrated by the ALJ citing a document from Ms. Wuertz's emergency-room visit in one sentence and then concluded in the next that she had never presented to the emergency room. *Smith-Johnson*, 579 F.App'x at 437 n.11. That the ALJ twice repeated the mischaracterization and then inferred from the purported lack of hospitalization that Ms. Wuertz's mental condition had not worsened since 2021 warrants a finding the mental RFC was not based on substantial evidence. *Simpson*, 344 F.App'x at 191.

In addition, remand is warranted because the mischaracterizations also show the ALJ did not build an accurate and logical bridge between evidence and conclusion. *Fleischer*, 774 F.Supp.2d at 877. The ALJ cited records documenting back-pain treatment that not only occurred earlier and later in time than the hospitalization but appear in Exhibit C3F before and after the hospitalization appears in the document. (*See* Tr. 23) (citing in same paragraph Tr. 560, 756)

20

(discussing lumbar injections in September 2021 and July 2022). This suggests that the ALJ not only considered Ms. Wuertz's treatment history during the time she was hospitalized but also considered the portions of the administrative record that documented her hospitalization, yet the ALJ did not mention the hospitalization. Because of this gap, the court cannot determine if the ALJ "discounted or merely overlooked" Ms. Wuertz's hospitalization in April 2022. *See Shrader*, 2012 WL 5383120, at *6.

Under either rationale, I recommend remand so the ALJ can properly assess Ms. Wuertz's psychiatric condition and issue a new RFC based on the record as a whole. Remand "is the *best* remedy for cherry-picking precisely because it *avoids* any re-weighing of evidence by this Court and places that responsibility where it belongs—with the administrative agency on remand." *Cross o/b/o K.C. v. Comm'r of Soc. Sec.*, No. 5:20-cv-2787, 2022 WL 574260, at *5 (N.D. Ohio Feb. 25, 2022) (emphasis in original).

> **D.** **The mischaracterizations cannot be excused as harmless because the hospitalization was outside the regulatory lookback period or before the amended onset date.**

The Commissioner deflects the ALJ's mischaracterizations by arguing it is "reasonable to simply read the ALJ's statement[s] that Plaintiff's mental impairments did not cause her to go to the emergency room or to be hospitalized as meaning from her SSI filing date onward." (ECF #13 at PageID 1756). To the Commissioner, because Ms. Wuertz applied for SSI on April 23, 2023, and she was hospitalized on April 8 through April 12, 2022, the hospitalization "occurred both over a year before the relevant period and was outside of the twelve-month period for the ALJ to develop the record." (*Id.*). This argument fails because it misreads the regulation setting the 12-month lookback and ignores the fact that evidence from before the relevant period may still be probative of disability.

Under the relevant regulations, the Commissioner "will develop [a claimant's] complete medical history for at least the 12 months preceding the month in which you file your application unless . . . you say that your disability began less than 12 months before you filed your application." 20 C.F.R. § 416.912(b)(1).[6] The Commissioner contends the record would be developed for the 12-month period starting on the application date, meaning April 23, 2022 to April 23, 2023. But, as Ms. Wuertz points out, the Commissioner misreads the regulation. (*See* ECF #14 at PageID 1763). The regulation requires the record be developed "for at least *the 12 months preceding the month* in which you file your application" 20 C.F.R. § 416.912(b)(1) (emphasis added). Thus, the lookback period is not from April 23, 2022 to April 23, 2023, but includes all of April 2022 to April 2023.[7]

But both parties overlook the other clause of § 416.912(b)(1) that shortens the lookback period if "you say that your disability began less than 12 months before you filed your application." Ms. Wuertz alleged she became disabled first beginning September 6, 2022 (*See* Tr. 118, 129) and then, before the hearing, she "agree[d] to amend her onset date to the date of filing of April 20, 2023." (Tr. 320; *see also* Tr. 328). Both are less than 12 months before the April 23, 2023 application date. Thus, § 416.912 would not require developing the record for all of April 2022 to April 2023.

---

[6] The Commissioner cites the 2014 version of this regulation when the quoted language was set forth in subsection (d). (*See* ECF #13 at PageID 1756) (citing 20 C.F.R. § 416.912(d) (as amended June 12, 2014)). The difference in versions is immaterial here because the section at issue was renumbered and the language was not materially changed. *See Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed.Reg. 5844, 5874-75, 2017 WL 168819 (Jan. 18, 2017).

[7] The same result would occur under the 2014 version of the regulation. *See* 20 C.F.R. § 416.912(d) (eff. June 12, 2014)).

Yet the April 2022 hospitalization is not meaningless because it is outside the lookback period under **§** 416.912(b). The Sixth Circuit does "not endorse the position that all evidence or medical records predating the alleged date of the onset of disability . . . are necessarily irrelevant or automatically barred from consideration[.]" *DeBoard v. Comm'r of Soc. Sec.*, 211 F.App'x 411, 414 (6th Cir. 2006). Instead, "evidence . . . predating the onset of disability, when evaluated *in combination with other evidence*, may help establish disability." *Id.* (emphasis in original). Thus, despite the April 2022 hospitalization occurring outside the lookback period (and before the onset of disability), it is still probative of disability when evaluated in combination with other evidence.

The court may also reject the Commissioner's argument as an impermissible post hoc rationalization. A reviewing court "cannot come and rewrite the ALJ's reasoning" or "offer a post hoc explanation for the ALJ's vague determination." *See Buck v. Comm'r of Soc. Sec.*, No. 3:22-cv-1071, 2023 WL 3978288, at *3 (N.D. Ohio June 13, 2023). Instead, the ALJ's decision "must be upheld, if at all, on the basis articulated by the agency itself." *Johnson v. Comm'r of Soc. Sec.*, 193 F.Supp.3d 836, 847 (N.D. Ohio 2016). There is no indication that the ALJ shared the Commissioner's view that evidence before April 23, 2022 is irrelevant. To the contrary, the ALJ mentioned that "[i]n September 28, 2021, it was noted that the claimant had an epidural injection with ninety percent improvement in her pain." (Tr. 23). It would make no sense for the ALJ to disregard evidence from April 2022 as irrelevant to Ms. Wuertz's mental limitations but at the same time consider evidence from September 2021 as relevant to her physical limitations.

### E. The ALJ did not impliedly consider the hospitalization by adopting the prior administrative medical findings.

The Commissioner also argues any mischaracterizations by the ALJ are harmless because the ALJ accepted the prior administrative medical findings that considered the April 2022

23

hospitalization. (ECF #14 at PageID 1756-57). This argument conflates the initial administrative finding (that discussed the hospitalization) and findings on reconsideration (that the ALJ found most persuasive). But even if the prior administrative findings are substantial evidence for the ALJ's mental RFC decision, the ALJ's decision still lacks an accurate and logical bridge from evidence to result because of the mischaracterization of the April 2022 hospitalization and the lack of any explanation.

To start, it is hard to see how the prior administrative findings considered the April 2022 hospitalization. The Commissioner correctly points out that Dr. Johnson, the state agency consultant performing the initial review, listed the April 2022 hospitalization among the evidence considered in her opinion. (*See* Tr. 119). Yet, Dr. Johnson concluded Ms. Wuertz "has had no ER visits or hospitalizations for conditions." (Tr. 121). Thus, while Dr. Johnson may have considered the April 2022 hospitalization, that fact is far from clear from his opinion. But presuming he had, the ALJ adopted the opinion on reconsideration that found Dr. Johnson's "initial level PRT is neither consistent with, nor supported by, the objective evidence." (*See* Tr. 134). So, if Dr. Johnson did consider the April 2022 hospitalization, the ALJ rejected that assessment.

The opinion on reconsideration also did not consider the 2022 hospitalization. Unlike Dr. Johnson, Dr. Richardson did not list the April 2022 hospitalization as evidence he considered for his report on reconsideration review. (*See* Tr. 131-33) (discussing evidence beginning June 2022). And Dr. Richardson adopted mental RFC findings by a prior ALJ made in April 2021, a year before the hospitalization. (Tr. 134). The ALJ in 2021 could not have considered a hospitalization occurring in 2022. Thus, Dr. Richardson's opinion on reconsideration did not consider the April 2022 hospitalization directly or indirectly by adopting the 2021 ALJ's decision. Because the ALJ

24

found Dr. Richardson's opinion on reconsideration the "most persuasive" (Tr. 26), the Commissioner's argument that the ALJ could have impliedly considered the 2022 hospitalization through that opinion falls flat.

Setting aside the lack of clarity on whether the state agency consultants actually considered the April 2022 hospitalization, there is no reason to think the ALJ impliedly considered the hospitalization. The ALJ made clear multiple times in the decision that she thought Ms. Wuertz had not been hospitalized. (*See* Tr. 25 ("she was without exacerbation requiring emergency room presentation or hospitalization."), 26 ("the absence of inpatient hospitalization . . . there is no evidence of any ER or hospital admissions for any me[n]tal issues")). Thus, even if the Commissioner were correct that the state agency consultants considered the hospitalization, the argument cannot escape the ALJ's express language that she thought no hospitalization occurred.

Worse still, if the ALJ impliedly considered the April 2022 hospitalization, then at most that provides substantial evidence supporting the mental RFC; it does not resolve the problem of the lack of an accurate and logical bridge in the ALJ's explanation. These are independent faults with the ALJ's decision and "the fact that substantial evidence might exist in the record does not justify the administrative law judge's failure to adequately articulate his reasons." *Shrader*, 2012 WL 5383120, at *6; *accord Fleischer*, 774 F.Supp.2d at 877 ("this Court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."). Thus, even were the court to credit the Commissioner's argument, remand would remain appropriate.

**II.** **While the ALJ considered the physical-examination evidence, remand is also warranted for the ALJ to consider the 2024 MRIs of Ms. Wuertz's spine and issue a new RFC based on the record as a whole.**

Ms. Wuertz also challenges at the ALJ's factual findings explaining the physical RFC limitations. First, she argues the ALJ discussed only some of the physical examination findings and omitted others. (ECF #11 at PageID 1746-47). Second, she argues the ALJ wrongly concluded her physical condition had not worsened since the earlier ALJ decision in 2021 when she did not discuss multiple MRIs of her spine taken in 2024 that indicated impingement of the nerve root not shown in the 2022 MRIs. (ECF #11 at PageID 1747-48). The Commissioner counters that the ALJ is not obligated to discuss every piece of record evidence and because Ms. Wuertz's MRIs showed just mild abnormalities, reading those findings to support greater limitations requires reweighing the evidence. (ECF #13 at PageID 1757, 1759). The Commissioner also emphasizes the ALJ set forth a more limited RFC than the prior administrative findings. (*Id.* at PageID 1758).

**A.** **The ALJ's analysis of the physical examination findings as whole does not show a selective review of the record.**

Ms. Wuertz first argues the ALJ mischaracterized the physical examination findings as showing a "normal gait" and "5/5 strength." (Tr. 24). Ms. Wuertz contends the ALJ did not acknowledge the other physical examinations in the record with different findings, including examinations in:

- **December 2022**, which showed 4/5 hip flexion, 4+/5 knee flexion and extension, and 4+/5 ankle dorsiflexion as well as a limited lumbar range of motion. (*See* Tr. 407);

- **August 2023**, which showed 4+/5 left hip flexion, 4/5 right hip flexion, and 4+/5 knee flexion. (Tr. 1448-49); and

- **September 2023**, which showed she walked with an antalgic gait. (*See* Tr. 1459).

26

(ECF #11 at PageID 1746). Ms. Wuertz also contends the ALJ omitted other physical examinations showing certain objective indicators like pain, discomfort, positive straight-leg-raise tests, and positive Faber tests. (*Id.* at PageID 1747) (citing Tr. 366, 380, 407, 1490).

To start, the ALJ's finding of "[p]hysical examination revealed normal gait and 5/5 strength in all four extremities" does not characterize all the physical examinations in the record. Reading the ALJ's decision as a whole and with common sense, as the court must, *see Buckhannon v. Astrue*, 368 F.App'x 674, 678-79 (7th Cir. 2010), the specific finding Ms. Wuertz disputes referenced examinations after her August 2022 laminotomy and microdiscectomy:

> Therefore, the claimant is limited to a limited range of sedentary work as set forth above. The claimant underwent a lumbar laminectomy and microdiscectomy in August 2022 with complete resolution of right side numbness tingling pain and radiating discomfort as noted by the record, which is inconsistent with the claimant's testimony. Physical examination revealed normal gait and 5/5 strength in all four extremities. She continued to complain of back pain but treatment remained conservative.

(Tr. 24). While the opening sentence of the paragraph speaks generally, the body of the paragraph discusses the August 2022 procedures. And the examination two weeks after the August 2022 procedures found Ms. Wuertz showed "sensation grossly intact on exam" and "strength 5/5." (Tr. 529). The note did not describe her gait and the closest finding to gait was "some pain to lateral aspects of both legs" and no "numbness or tingling to legs." (*Id.*). That the note did not comment on Ms. Wuertz's gait and found intact sensation and muscle strength with some pain in Ms. Wuertz's legs are the kind of indications that her gait was normal, which "a reasonable mind might accept as adequate to support a conclusion." *See Besaw*, 966 F.2d at 1030 (describing the substantial-evidence standard). Thus, the ALJ was not finding the physical examinations all showed normal gait and 5/5 strength, but that one examination closely following her surgery did.

The ALJ's discussion as a whole does not show a selective review of the record even though the ALJ did not specifically discuss the December 2022, August 2023, and September 2023 physical examinations Ms. Wuertz called out. Beginning with the December 2022 and August 2023 examinations, Ms. Wuertz argues they were selectively omitted but both physical therapy notes (*see* Tr. 405, 1447) and the ALJ discussed Ms. Wuertz's physical therapy generally. (*See* Tr. 23 ("She underwent physical therapy with no change in pain."), 24 ("She received physical therapy with only partial relief")). Though the ALJ did not specifically mention that her flexion and range of motion were rated from 3/5 and 3+/5 respectively to 4/5 and 4+/5, the ALJ accurately described that physical therapy provided little improvement in pain. (*See* Tr. 515, 405-07, 1448-49). I again note that an ALJ need not "discuss each piece of data in [the] opinion, so long as [the ALJ] consider[s] the evidence as a whole and reach[es] a reasoned conclusion." *Boseley*, 397 F.App'x at 199. That the ALJ commented physical therapy was unsuccessful suggests the ALJ considered the physical therapy records and reached a decision based on the record as a whole, even though the ALJ did not directly compare the flexion and motion ratings to the muscle-strength ratings in other physical examinations.

Next, Ms. Wuertz argues the ALJ selectively omitted the September 2023 physical examination showing an antalgic gait when the ALJ found the physical examinations showed a normal gait. In September 2023, Ms. Wuertz exhibited an antalgic gait after presenting to her physician with left-foot pain. (*See* Tr. 1455-56, 1459). The ALJ did not mention this examination in the decision and commented that Ms. Wuertz exhibited a "stable" or "normal" gait in examinations in March and May 2023. (*See* Tr. 24-25). Then the ALJ concluded "the physical exams note stable gait." (Tr. 26). Though the ALJ omitted the one contrary gait finding, the

discussion reflects the overall gait findings, and the September 2023 examination was an outlier to that trend.

In September 2023, Ms. Wuertz was diagnosed with a flare-up from her previous foot fracture. (Tr. 1466-67). By November 2023, there was no comment on her gait. (Tr. 1581-82). And in both March and May 2023, Ms. Wuertz's gait was "normal" and "stable" respectively. (Tr. 392, 366). The ALJ does not selectively describe the record by omitting one abnormal gait finding in September 2023 when there were normal gait findings both before and after and the abnormal treatment note diagnosed the gait issue as caused by temporary flare-up of a healing foot fracture. *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009) (claims an ALJ cherry-picked evidence "can be described more neutrally as weighing the evidence"). To the contrary, the ALJ's discussion shows the ALJ "implicitly resolved the conflicts" in the gait findings by discrediting the one outlier and focusing on the overall trend. *See Smith-Johnson*, 579 F.App'x at 437 n.11.

As for the other physical examinations Ms. Wuertz argues the ALJ selectively omitted, these examinations found various objective indicators like pain, discomfort, positive straight-leg-raise tests, and positive Faber tests. (ECF #11 at PageID 1747) (citing Tr. 336, 366, 380, 407, 1490). But going through these examinations and the ALJ's discussion does not show error. To start, one cited examination merely lists her vital signs. (Tr. 336). Another is a physical therapy note (*see* Tr. 407) that, as addressed above, the ALJ discussed at a general level. And the ALJ specifically mentioned a third examination Ms. Wuertz claimed was omitted (*see* ECF #11 at PageID 1747) (citing Tr. 363-66), finding:

> On May 11, 2023, she continued to complain of back pain that was aggravated by prolonged standing, lifting, and bending. Recent imaging showed L1-2 level posterior disc herniation with moderate spinal stenosis. Physical examination was

> unremarkable with stable gait and 5/5 strength. She was diagnosed with lumbar post
> laminectomy syndrome.

(Tr. 24). The May 11, 2023 examination noted "[n]ormal range of motion" and "no deformity" in her extremities, "[n]o apparent deformity" and "[r]ange of motion limited" in her lumbar spine, "[f]emoral nerve stretching reproduced her pain," "[g]ait stable," and "[m]otor strength 5/5 in both lower extremities in all major muscle group." (Tr. 366). While the ALJ's characterization that these findings are "unremarkable with stable gait and 5/5 strength" is not completely accurate, there was not error. While the ALJ properly described the gait and motor-strength findings, a positive femoral nerve stretch is not ordinarily "unremarkable." The femoral-nerve-stretch test can indicate femoral nerve irritation due to lumbosacral lesion or hip lesion, a protruding or bulging disc, or other dysfunctions of the femoral nerve or roots. *See Nicely v. Astrue*, No. 4:10-cv-2412, 2012 WL 1231215, at *7 n.27 (M.D. Pa. Apr. 12, 2012). Thus, a positive finding would ordinarily be remarkable, had the record not already established the cause of Ms. Wuertz's chronic back pain as protruding and herniated discs at multiple joints first abutting and then pressuring her nerves. (*See* Tr. 834 and 821-22 (2022 MRIs showing protruding discs); Tr. 1559-60, 1563 (2024 MRI showing multiple extruding discs impinging or abutting on nerve roots). While describing that finding generally as "unremarkable" is not strictly accurate, there is no error in overlooking it as there is no open question about the etiology of Ms. Wuertz's pain. (*See* Tr. 20 (identifying "degenerative disc disease of the lumbar spine with left-sided L1 disc herniation" and "thoracic and cervical degenerative changes" as severe impairments). This strikes out three of the examinations and leaves the examinations from March and July 2023.

Ms. Wuertz is correct the ALJ did not discuss the examinations from March 22, 2023. (ECF #11 at PageID 1747) (citing Tr. 380). But again, the ALJ's discussion does not show error.

While the ALJ did not discuss the March 22, 2023 examination, the ALJ did discuss Ms. Wuertz's March 16, 2023 emergency-room visit for her back pain. (Tr. 24) (citing Tr. 384-89). On both March 16 and March 30, 2023, Ms. Wuertz had back pain that did not radiate down the leg (Tr. 376, 384), stable gait, and full strength in her legs (Tr. 380, 387). Though there were no straight-leg-raise tests on March 16 (*see* Tr. 387), Ms. Wuertz rated her pain as 7/10 on March 16 and a 4/10 on March 30 (*see* Tr. 377, 387). These findings are close in time and not materially different. The straight-leg-raise test "checks for radiculopathy." *Massey v. Comm'r of Soc. Sec.*, 409 F.App'x 917, 919 n.1 (6th Cir. 2011). Again, because there is no question about the etiology of Ms. Wuertz's back pain, omitting a positive straight-leg-raise test did not leave an open question about her condition the same way a positive femoral-nerve-stretch test is unremarkable. The ALJ does not cherry-pick evidence by discussing an emergency-room visit with a worse pain rating over a pain-management follow-up two weeks earlier that has an immaterial straight-leg-raise finding. *See White*, 572 F.3d at 284 (claims an ALJ cherry-picked evidence "can be described more neutrally as weighing the evidence"). Nor is it the role of the court to independently reweigh the treatment records and say which is better evidence of Ms. Wuertz's condition. *See Brainard*, 889 F.2d at 681.

Similarly, the July 2023 examination documented negative passive and crossed straight-leg-raise tests but positive active straight-leg-raise test and a positive FABER test. (*See* Tr. 1490). The FABER test is used to identify the presence of hip pathology by attempting to reproduce pain in the hip, lumbar spine or the sacroiliac region. *Kellie B. v. Comm'r of Soc. Sec.*, No. 1:22-cv-11213, 2023 WL 5154494, at *5 (E.D. Mich. Aug. 10, 2023). Because the straight-leg-raise tests and FABER test both identify the cause of pain, they offer little additional insight to the decision

31

because the cause of Ms. Wuertz's back pain is well-established. Thus, the ALJ did not misrepresent the record by not discussing these objective indicators.

In sum, the ALJ did not misrepresent the record regarding Ms. Wuertz's physical examinations. It bears repeating the ALJ can consider all the evidence without addressing every piece of evidence in the record. *Boseley*, 397 F.App'x at 199. The decision shows the ALJ considered the physical examinations overall. The ALJ expressly mentioned one physical examination Ms. Wuertz claims was omitted. (Tr. 24) (citing Tr. 366). The ALJ also generally discussed Ms. Wuertz's physical therapy as offering little relief, thus accounting for three examinations taken in physical therapy appointments she claims were omitted. (*See* Tr. 23, 24; *see also* Tr. 515, 405-07, 1448-49). The ALJ's finding that the examinations overall showed a normal gait shows the ALJ credited the overall trend of normal gait findings over the one outlier caused by a flared-up foot fracture. (*See* Tr. 366, 392, 529; *but see* Tr. 1455-56, 1459). And that the ALJ discussed an emergency-room visit with a worse pain rating over a pain-management follow-up two weeks earlier does not suggest the ALJ cherry-picked evidence. (*Compare* Tr. 384, 387 *with* Tr. 376-77, 380). True, the ALJ did not mention one examination that took her vitals (*see* Tr. 336), but a single check of vital signs will not alone determine disability. The ALJ also did not discuss some examinations that documented straight-leg-raise and FABER tests, but the cause of Ms. Wuertz's pain is well-established and the ALJ did not misrepresent that. Thus, the ALJ's analysis of the physical examinations is not at all like the discussion of Ms. Wuertz's psychological treatment. The ALJ did not say Ms. Wuertz's had not sought treatment for her back pain when she had. The ALJ omitted basic vitals and diagnostic tests that provide no new information while discussing many other examinations, demonstrating the ALJ considered the physical examinations overall.

I thus decline to recommend remand on this basis.

**B.      The ALJ's finding that Ms. Wuertz's condition was unchanged since 2021 without discussing the 2024 MRIs of her spine showing nerve-root impingement deprives the physical RFC of substantial evidence and shows the ALJ did not build an accurate and logical bridge between the evidence and the conclusion.**

Second, Ms. Wuertz argues the ALJ's decision is "silent" about two MRIs taken in January 2024 that she argues show a worsening condition from 2022 and contradict the ALJ's finding that "[n]othing in the record points to limitations inconsistent with the RFC set forth above or supports a worsening in the claimant's condition since the prior ALJ decision." (ECF #11 at PageID 1747-48). The Commissioner responds that the MRIs showed merely mild abnormalities and reading those findings to support greater limitations requires reweighing the evidence. (ECF #13 at PageID 1757, 1759). The Commissioner also emphasizes the ALJ set forth a more limited RFC than the prior administrative findings. (*Id.* at PageID 1758).

Ms. Wuertz argues the ALJ did not consider two MRIs in January 2024, one of her lumbar spine and the other of her thoracic spine, when concluding her condition was unchanged since the previous ALJ's decision in 2021. (ECF #11 at PageID 1747-48). While the ALJ mentions a 2022 MRI and a 2023 x-ray specifically (Tr. 23, 24), the ALJ does not mention the 2024 MRIs. The 2024 lumbar MRI showed an "interval right L1 hemilaminectomy" (the August 2022 surgery), "residual/recurrent left subarticular disc extrusion at L1-L2 impinging on the transversing left L2 nerve root," and "left foraminal/extraforaminal disc protrusions at L3-L4 and L4-L5 with abutment of the existing left L3 and L4 nerve roots." (*See* Tr. 1563).

Some of the findings on the 2024 lumbar MRI appear on the 2022 lumbar MRI. The 2022 lumbar MRI showed "[l]eft paracentral disc extrusion at L1-2 narrowing the left lateral recess" and "[l]eft foraminal disc protrusion at L4-5 with mild-to-moderate left foraminal narrowing and disc

material abutting the exiting left L4 nerve root." (Tr. 821-22). Thus, both the 2022 and 2024 MRIs show left foraminal disc protrusions at the L4-L5 level abutting the L4 nerve root. (*Compare* Tr. 822 *and* Tr. 1563). The 2024 lumbar MRI additionally shows a disc extrusion at L1-L2 level impinging on the nerve root, a protrusion at the L3-L4 level, a protrusion abutting the L3 nerve root. (Tr. 1563). The thoracic MRI showed a "disc extrusion at T11-12 resulting in mild left foraminal stenosis and mild spinal canal stenosis with contact of the left ventral surface of the cord." (Tr. 1559-60).

Impingement of the nerve root is no small component in evaluating the functional impact of chronic back pain. For illustrative purposes only, "[s]ign(s) of nerve root irritation, tension, or compression, consistent with compromise of the affected nerve root" and "[f]indings on imaging consistent with compromise of a nerve root(s) in the cervical or lumbosacral spine" are elements of Listing 1.15, the listing for spine disorders "resulting in compromise of a nerve root(s)." *See* 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 1.15(B)(2), (C). Thus, that the L1-L2 disc extrusion now is impinging on the nerve root could affect the analysis of Ms. Wuertz's back condition.

The lack of discussion is particularly problematic as an SSI claimant must establish disability after the application date. *See* 20 C.F.R. § 416.335; *see also Koster v. Comm'r of Soc. Sec.*, 643 F.App'x 466, 478 (6th Cir. 2016). The January 2024 MRIs is the only imaging taken after Ms. Wuertz filed her application in April 2023. There also is not broad discussion of *all* the imaging in the ALJ's summary (*see* Tr. 26), which can indicate the ALJ considered the record as a whole. *See Barto v. Comm'r of Soc. Sec.*, No. 1:23-cv-1352, 2024 WL 1604114, at *4 (N.D. Ohio Apr. 12, 2024). There is only a discussion of the 2022 and 2023 imaging. Nor was there any discussion about the 2024 MRIs when discussing the Listings at Step Three that could provide insight after reading the

decision as a whole. (*See* Tr. 21). Notably, the ALJ cited to other pages in Exhibit C7F, which contains the reports of the 2024 MRIs (*see* Tr. 24, 25).

Had the ALJ engaged with the 2024 lumbar MRI, the ALJ may have nevertheless determined Ms. Wuertz's condition is not disabling. But without any analysis of the 2024 MRIs showing impingement of the nerve root, among other things, the court cannot determine whether the ALJ "discounted or merely overlooked" the 2024 MRIs in concluding Ms. Wuertz's condition was unchanged since 2021. *See Shrader*, 2012 WL 5383120, at *6. Nor did the ALJ "implicitly resolve[] the conflicts in the evidence" between the different imaging studies showing different degenerative changes in her lumbar spine. *Smith-Johnson*, 579 F.App'x at 437 n.11.

The Commissioner contends that because the 2024 MRIs show merely mild abnormalities, the omission "is not enough to overcome the deferential substantial evidence standard." (ECF #13 at PageID 1759). "While the substantial evidence standard is deferential, the Sixth Circuit has emphasized that the chief limitation to that deference "is the requirement that all determinations be made based upon the record in its entirety." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 249 (6th Cir. 2007) (citing *Houston v. Sec'y of Health & Hum. Servs.*, 736 F.2d 365, 366 (6th Cir. 1984)). "This requirement that determinations be made in light of the record as a whole helps to ensure that the focus in evaluating an application does not unduly concentrate on one single aspect of the claimant's history[.]" *Id.*; *see also* 20 C.F.R. § 416.920(e) (the RFC will be "based on all the relevant medical and other evidence" in the case record). Nor does a remand necessarily mean the court is trying the case de novo. Rather, as I noted above, remand remains "the *best* remedy for cherry-picking precisely because it *avoids* any re-weighing of evidence by this Court and places that

responsibility where it belongs—with the administrative agency on remand." *Cross*, 2022 WL 574260, at *5 (emphasis in original).

The Commissioner also emphasizes the ALJ set forth a more limited RFC than the prior administrative findings. (ECF #13 at PageID 1758). The problem, however, is the ALJ failed to explain the omission of the 2024 MRIs, not that other evidence in the record might constitute substantial evidence. The ALJ could not have impliedly considered the 2024 MRIs through the prior administrative findings because the state agency review was completed in 2023 and thus their opinions cannot have incorporated the 2024 MRIs. (*See* Tr. 123, 136). While "it is not error for an ALJ to rely on medical opinions from physicians who have not reviewed the entire record," reliance on those opinions does not insulate the ALJ from reviewing the evidence developed after those opinions. *Edwards v. Comm'r of Soc. Sec.*, No. 1:17-cv-925, 2018 WL 4206920, at *6 (N.D. Ohio Sept. 4. 2018) (*citing McGrew v. Comm'r of Soc. Sec.*, 343 F.App'x 26, 32 (6th Cir. 2009) (indicating that an ALJ's reliance on the prior administrative findings that were outdated was not error "so long as the ALJ considers the post-dated evidence in formulating her opinion.")); *see also Barto*, 2024 WL 1604114, at *4 (noting "the ALJ relied on the State agency opinions, which did explicitly reference the MRI and x-ray evidence."). Though Ms. Wuertz does not argue the ALJ improperly relied on the prior administrative findings, the ALJ's reliance on those findings does not mean the ALJ considered the 2024 MRIs.

I thus recommend remand so the ALJ can properly assess Ms. Wuertz's physical condition and issue a new RFC based on the record as a whole.

CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I recommend the District Court **REVERSE** the Commissioner's decision denying supplemental security income and **REMAND** the matter under Sentence Four of 42 U.S.C. § 405(g) for further administrative proceedings not inconsistent with this Report and Recommendation.

Dated: March 23, 2026

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

OBJECTIONS, REVIEW, AND APPEAL

Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge. *See* Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health & Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-cv-186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).

37